IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 5, 2011

IN RE T.C.E.

Appeal from the Juvenile Court for Union County
No. 6959     Robert M. Estep, Judge

No. E2010-02031-COA-R3-PT-FILED-JUNE 28, 2011

This is a biological father's appeal from a judgment terminating his parental rights. The trial court found by clear and convincing evidence (1) that he had abandoned the child by willfully failing to visit during the four-month period immediately preceding the filing of the petition to terminate; (2) that he had not substantially complied with his obligations under a court-approved permanency plan despite reasonable efforts to reunite him with the child; and (3) that termination is in the best interest of the child. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Ben H. Houston II, Knoxville, Tennessee, for the appellant, D.B.E.

Robert E. Cooper, Jr., Attorney General and Reporter, and Elizabeth C. Driver, Senior Counsel, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

A.

We are dealing in this case with the parental rights of D.B.E. ("Father") to his seven year-old biological daughter, T.C.E. She was born January 2, 2004. The biological mother

is K.L.E.  Her rights were terminated in this case by order entered October 21, 2009.  That order has not been appealed and, with the passage of time, has become final.

The Department of Children's Services ("DCS" or "the Department") became involved with the family in the fall of 2007 after K.L.E. sought an order of protection related to Father's use of cocaine.  DCS secured an order of immediate protection that declared T.C.E. dependent and neglected, left her in the mother's home and prohibited any contact of Father with T.C.E. until he took some action to deal with his drug abuse.

In March of 2008, DCS secured protective custody of T.C.E. based on the drug use of the child's mother and Father's violation of the previous "no-contact" order.  In May of 2008, Father was allowed to begin supervised visitation with T.C.E.  He was allowed two hours twice a month subject to a negative drug screen prior to each visit.  Father failed to exercise all the visitation allowed.  He skipped visitation in June.  He visited once in each of the months of May, July, August, September, October, and November.  He visited twice in December 2008.  His last visit before this termination proceeding was filed was January 7, 2009. Lindsay Bennett, the DCS caseworker who was present for the January visitation, later testified that Father directed more attention to questioning Bennett than visiting with the child.  He did not exercise visitation again until July 27, 2009.

In April 2008, DCS developed a permanency plan with alternative goals, *i.e.*, reuniting T.C.E. with her parents or placing her in the custody of a relative.  Father's obligations under the plan were to (1) obtain a drug and alcohol assessment and comply with its recommendations; (2) obtain a mental health assessment and comply with its recommendations; (3) obtain stable housing approved by DCS and maintain it for 6 months; (4) have transportation including his own insurance and valid driver's licence; (5) obtain legal, stable employment; (6) sign certain documents and release forms; (7) complete parenting classes; (8) complete a bonding assessment and (9) begin paying child support.  The permanency plan was ratified by the juvenile court, as were subsequent permanency plans, each of which contained essentially the same assignments for Father.[1]  With one exception, Father signed all of the permanency plans.  He was informed in writing that failure to comply with his stated obligations could result his parental rights being terminated.

Father completed several of his assignments and made progress with respect to others.  He completed the alcohol and drug assessment in April 2008.  It did not recommend further

_____

[1]Some of the plans require Father to complete a psychosexual assessment because of an accusation made in another household.  We have not discussed this component in any detail because (1) it is undisputed that he completed the assessment, (2) there is no proof in this record that the accusation was ever confirmed in any respect, and (3) the accusation had nothing to do with T.C.E.

treatment. However, one reason that no treatment was recommended is because Father denied having a problem with drugs. He did have a relapse evidenced by failed drug tests in July and August 2009. According to Father, he completed another drug course and remained drug free throughout the course of the proceedings below. He completed the mental health assessment in August 2008, and the assessment did not recommend any treatment. He also completed parenting classes.

Father did not secure housing that was acceptable to DCS. When DCS took custody of T.C.E., Father lived with his mother and his uncle. Father slept on the couch, and one of the bedrooms was identified as T.C.E.'s. DCS refused to approve this home because it was not big enough. According to the caseworker, she discussed other options with Father, including HUD, but he preferred staying with his mother.

His plans reportedly changed in July of 2009 when he returned from working in Georgia. He claimed at that time that he was living with his girlfriend in Knoxville. The caseworker visited the home and noted that it was clean and had a room decorated for T.C.E. The caseworker also noted, however, that it did not appear that Father was really living in the girlfriend's home. None of his clothing or other indicia of residence were present. The caseworker would not approve the home because Father was not married to the girlfriend. The caseworker explained her objection at the termination hearing. The problem with the arrangement was that it did not offer T.C.E. the needed stability. Father had no guarantee that the child could remain in the girlfriend's home in case the parties separated. The girlfriend appeared at the termination hearing and testified for Father. She stated that she had lived in the same place since 1993 and was willing to assist Father in raising T.C.E. The girlfriend stated at one point that Father contributed money toward the mortgage and utilities. However, when pressed, she admitted that he only did that when he was working and that he only worked during the summer months. Also, her testimony was less than clear concerning the actual relationship between her and Father. At one point she claimed that she and Father did not sleep together because she knew Father was still married to K.L.E. and she did not believe in having sex with a married man. At other points in her testimony, she testified that Father spent part of the night in her bed on occasion. At another point, when pressed, she stated that they did spend the night together in her bed sometimes. Father testified that they slept together in her bed regularly, although he sometimes slept on the couch.

Father did not secure his own automobile, insurance or a driver's license. He testified at the termination hearing that his friends and family would willingly transport him and T.C.E. as needed. However, the proof at the hearing was that he had been arrested approximately ten times for driving without a license. Part of his problem stemmed from having been previously adjudged a habitual motor vehicle offender. At least some of these arrests resulted in Father's incarceration and interfered with his ability to fulfill his

responsibilities under the permanency plan. For example, he was incarcerated at the time of at least one scheduled visitation and at the time of at least one counseling session, the goal of which was to counsel Father on how to parent a child with T.C.E.'s reactive attachment disorder ("RAD"). The condition caused T.C.E. to "attach" as readily to strangers as to family members. Also, the termination hearing was continued on one occasion because Father was incarcerated.

Father did not pay any child support or provide any documentation of stable employment. He testified at the termination hearing that he could support T.C.E. from his income at odd jobs and landscaping. However, other than his testimony, Father could produce no proof of income for the last several years. He blamed his lack of visitation between January 2009 and July 2009 on a work trip that he allegedly made to Georgia, but he could not even identify by name one single employer during this time frame. Father's girlfriend testified that during the time he was working in Georgia, she saw him several times a week at her home in Knoxville.

A DCS caseworker testified that she made numerous unsuccessful attempts between January and July 2009 to contact Father through several different means, including computer searches and mail to his mother. On February 22, 2009, Father left a message for the caseworker informing her that he was in Georgia looking for work. He spoke with her in June 2009 and advised her that he could not visit T.C.E. because of "bogus" charges pending against him in Union County. At the termination hearing, he repeated the story about bogus charges, allegedly initiated through K.L.E.'s bribery of police. He supposedly "took care of" the matter which then freed him to pursue visitation in July of 2009.

DCS commenced this case with a sworn petition for termination filed on June 11, 2009. The grounds alleged are abandonment pursuant to Tenn. Code Ann. § 36-1-113(g)(1)(2010[2]) and substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2). The petition further alleges that it is in the child's best interest that Father's parental rights be terminated. Between the filing of the petition and the termination hearing, Father visited with T.C.E. on several occassions before the court suspended his visitation and ordered that Father undergo a psychological evaluation. The evaluation was performed by Diana McCoy, Ph.D. The parties stipulated McCoy's qualifications to testify as a licensed clinical psychologist. She met with Father on numerous occasions and gathered information also from other sources. She testified without objection that Father was, among other things, a pathological liar. His answers to her questions were evasive and changed frequently during the interviews. He told conflicting stories to her and

---

[2]This is the date of the binding on the current codification. Obviously, in 2009, the statute was in a bound volume or pocket part bearing an earlier date. The pertinent language has not changed recently.

-4-

in court about the number of his previous convictions. He blamed his positive drug screens on others. One personality test indicated that Father consistently tried to present himself in an unrealistically favorable light. This test confirmed the expert's opinion that Father had "difficulty" telling the truth without adorning it in his favor. McCoy testified that in her opinion Father's drug problems had not been overcome. She further testified that in her opinion it would be in the best interest of T.C.E. to terminate Father's parental rights and place the child in a home that could provide her the stability and attention she needed.

B.

Subsequent to the termination hearing, the court filed a memorandum opinion which was in large part a commentary on the testimony of the various witnesses. With regard to Father, the court stated: "The Court noted throughout the testimony of [Father] that he seemed to be very evasive and would weave his answers around the question at the moment."

The court set forth the following findings, among others, in the order terminating Father's parental rights:

> The Court finds that while [Father] completed his assessments, he cannot provide proof to the Court that he can provide stable housing, stable income, and stable transportation despite reasonable efforts by the Department to assist him. FSW Bennett discussed methods of obtaining housing with [Father] through HUD and/or an apartment. She made home visits to [Father]'s girlfriend's home, finding it to appear clean and appropriate, though there was no evidence of [Father] residing in the home. FSW further provided transportation to [Father] to and from visits with the child, assisted [Father] in scheduling appointments for his alcohol and drug, mental health, and pshychosexual assessments, and placed in-home services through Foothills for [Father] to complete specialized parenting classes. [Father], however, was arrested and incarcerated in Knox County after the first session with Foothills, so the services were discontinued by the provider due to his incarceration and non-compliance. The Court found [Father]'s testimony to be that he is living with his girlfriend while still married to [K.L.E.], the child's mother. His work is sporadic at best, and he does not have a driver's license. Furthermore, it was his testimony that he has not paid any child support.

Based upon the foregoing, the State has established by clear and convincing evidence that there has been substantial non-compliance by [Father] with the statement of responsibilities in the permanency plans in this case pursuant to Tenn. Code Ann. § 36-1-113(g)(2) and that the Department made reasonable efforts to assist him in completing the requirements to no avail.

Pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(i), 36-1-102(1)(C), 36-1-102(1)(E), the Court may terminate parental rights when a parent has abandoned the child by willfully failing to visit the child for a period of four (4) months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent of the child who is the subject of the petition for termination of parental rights.

In this case, the Court finds that there is clear and convincing evidence that [Father] abandoned the child [T.C.E.] by willfully failing to visit her during the four-month period preceding the filing of the Petition to Terminate Parental Rights.  The Department filed the Petition to Terminate Parental Rights on June 11, 2009.  The Court finds that [Father] did not visit the child at all between January, 2009, and the filing of the petition in June, 2009, a period exceeding four months. . . . .  [Father] was able to visit the child, yet he testified that he went to the state of Georgia to avoid a "bogus" charge set up against him in Union County, Tennessee.

Based upon the foregoing, the State has established by clear and convincing evidence that [Father] abandoned the child pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(i), 36-1-102(1)(C), 36-1-102(1)(E).

Under Tenn. Code Ann. § 36-1-113(i)(1), the Court is required to find that termination of parental rights is in the child's best interest.

In this case, the Court finds that there is clear and convincing evidence that termination of [Father]'s parental rights is in the best interest of the child in that [Father] has not made lasting

changes in his lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. [Father] continues to have unstable housing, unstable transportation, and unstable employment. He further has trouble balancing child safety versus drug use and has erratic behavior. [Father] is unable to provide stable housing or to be a stable parent, and he is a pathological liar in the expert opinion of Dr. Diana McCoy.

There is no meaningful relationship between [Father] and the child. His interaction during supervised contact with the child, both with FSW Bennett and Dr. Diana McCoy, seemed to be less about the well-being of the child and more about desiring to argue with the caseworker. He abandoned the child for several months in 2009, not visiting her for a period exceeding six months from January 11, 2009, to July 27, 2009.

There is continued criminal activity by [Father] by his continuing to drive without a license. The termination of parental rights hearing was postponed from the last setting due to Father's incarceration. He consistently violates the law and has a long history of drug abuse.

[Father] has not maintained regular visitation or contact with the child. As previously stated, he abandoned the child for several months in 2009, not visiting her for a period exceeding six months from January 11, 2009, to July 27, 2009.

The Court makes its finding that termination of [Father]'s parental rights is in the best interest of [T.C.E.] based significantly upon the testimony of Dr. Diana McCoy whom the Court qualified as an expert upon stipulation of the parties and whom the Court found to be a credible and reliable witness.

Based upon the foregoing, the State has established by clear and convincing evidence that termination of [Father]'s parental rights is in the best interest of . . . [T.C.E.] pursuant to Tenn. Code Ann. §§ 36-1-113(i)(1)-(4), (7) and (9).

(Headings omitted.)

II.

Father raises the following issues on appeal:

> Whether the evidence demonstrates that DCS failed to make reasonable efforts to reunify T.C.E. with Father.

> Whether DCS failed to prove "substantial noncompliance" with the permanency plan by clear and convincing evidence.

> Whether DCS failed to prove by clear and convincing evidence that Father's failure to visit was willful.

> Whether DCS failed to prove by clear and convincing evidence that it was in T.C.E.'s best interests to terminate Father's parental rights.

III.

The standard of review of a judgment terminating parental rights was succinctly stated in *In re F.R.R., III*, 193 S.W.3d 528 (Tenn. 2006).

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (*citing* Tenn. Code Ann. § 36–1–113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*Id*. at 530. In weighing the evidence, we give great deference to the trial court's determinations of witness credibility. Findings which turn on credibility will not be reversed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835,

838 (Tenn. 2002). Questions of law are reviewed *de novo* with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 745 (Tenn. 2002).

Further,

> [i]t is well established that parents have a fundamental right to the care, custody, and control of the parent's children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2)[t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child." Tenn. Code Ann. § 36–1–113(c)(Supp. 2007); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36–1–113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002–02603–COA–R3–JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed Aug. 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

*In re Tylon L.D.*, No. E2010–01744–COA–R3–PT, 2011 WL 1884634, at *3 (Tenn. Ct. App. E.S., filed May 18, 2011)(brackets in original).

IV.

A.

Before addressing the individual issues, it will be helpful to briefly review the statutes directly applicable to parental termination proceedings. The starting point is with Tenn. Code Ann. § 36-1-113. The pertinent provisions, with respect to this case, are as follows:

> (c) Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.
>
> \* \* \*
>
> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
>
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4 . . .

*Id*.

The only ground for abandonment alleged in the petition is that found in Tenn. Code Ann. §36-1-102(1)(A)(i)(2010). That particular provision defines abandonment in the following terms:

For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child . . . .

*Id*.

### B.

We begin with the issue of abandonment because, despite some problems with the proof put on by DCS which we will discuss later, we find abandonment dispositive of the case. Father concedes in his brief that "he did not visit his child in the four months immediately preceding the filing of this termination petition on June 11, 2009." He argues, however, that his failure to exercise visitation was not willful. He correctly notes that "a parent who attempt[s] to visit and maintain relations with his child, but [i]s thwarted by . . . circumstances beyond his control," is not guilty of willful abandonment. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). This is because "[w]illful conduct consists of acts or failures to act that are intentional and voluntary rather than accidental or inadvertent." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). In other words, willfulness involves some amount of intent. *Id*.

Father argues that he did not act willfully because he was forced by his circumstances to work in Georgia, which in turn prevented him from visiting with T.C.E. First, we are not at all convinced that Father actually did substantial work in Georgia. Father wants to tout the proof as undisputed, but that is an overstatement. The trial court found that Father was not believable. The record fully supports the trial court's observation that Father was "very evasive and would weave his answers around the question at the moment." For example, when asked about his employment, he testified that he was out of work because of the economy. This story evolved into testimony that "immigrants have all the work pretty much." He later testified that he had applied "several places." When asked to name the places where he applied, Father ramblingly listed Wal-Mart, Target, Food City, Chick-fil-A, McDonald's, and Wendy's in the most generic of terms without giving a store location. He testified that he had never gotten an interview at any place he had applied. He later testified that some of the potential employers told him "they were looking for young people" and that he, Father, "had too much experience."

Also, despite trying to excuse his lack of visitation on working out of state, under vigorous questioning about when he was in Georgia, Father testified,

> I said I was in and out. I said I was just in and out, you know.
> So, I can't say – recommend [sic] to say I was in Georgia at this
> time or not.

The girlfriend's testimony confirms that during the time Father was supposedly in Georgia working, she saw him several times a week in Knoxville. Moreover, it is undisputed that despite Father's alleged preoccupation with work in Georgia for several months, he did not pay any child support. The only explanation he offered for his failure to pay support was the incredulous claim that his attorney advised him not to pay support despite the obligation in the permanency plan. Father's testimony can only be viewed as an inconsistent series of excuses constructed after the fact.

We conclude there is clear and convincing evidence that Father's failure to visit T.C.E. was willful. Even if he did work in Georgia, the evidence is clear and convincing that he was, at most, "in and out" of Georgia. The proof is clear that he was often in Tennessee in fairly close proximity to T.C.E. and could have visited with T.C.E. He willfully chose not to visit with her. Father does not contend in his brief that the "bogus" charges allegedly lodged against him in Union County excuse his failure to exercise visitation with T.C.E. We will treat that testimony and argument as abandoned. *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006)(failure "to cite to any authority or to construct an argument regarding [a] position on appeal" constitutes a waiver of the issue).

C.

We will next address Father's argument that DCS failed to present clear and convincing evidence that DCS made reasonable efforts to reunite T.C.E. with him. It is well-established that once DCS removes a child from the custody of its parents, absent some factor in the home that exposes the child to "substantial risk of harm," DCS is obligated to make " 'reasonable efforts' to make it 'possible for the child to return safely to the child's home.' " *In re C.M.M.*, NO. M2003-01122-COA-R3-PT, 2004 WL 438326 at *6 (Tenn. Ct. App. M.S., filed March 9, 2004)(*quoting* Tenn. Code Ann. § 37-1-166). "Termination proceedings based on the grounds in Tenn. Code Ann. § 36-1-113(g)(4)-(8) usually will not require the Department to demonstrate that it has made reasonable efforts to reunite a child with his or her parents." *Id*. at n.26. "Typically, termination proceedings based on the grounds in Tenn. Code Ann. § 36-1-113(g)(1)-(3) generally require the Department to demonstrate that it has made reasonable efforts to reunite a child with his or her parents." *Id*. at n.27. One way of demonstrating reasonable efforts is "by introducing evidence that

-12-

the parent 'has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible.' " *Id*. at *6 (*quoting* Tenn.Code Ann. § 36-1-113(i)(2)).

Other principles that we must observe with regard to DCS's obligation of reasonable efforts are:

> The Department's statutory obligation to make "reasonable efforts" to preserve, repair, or restore parent-child relationships need not be "Herculean." The General Assembly has defined "reasonable efforts" as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). The reasonableness of the Department's efforts must be decided on a case-by-case basis. Determining whether the Department's efforts have been reasonable requires the courts to consider, among other factors: (1) the reasons for separating the parent from his or her child or children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the separation, (5) the resources available to the Department, (6) the duration of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial separation, the requirements in the permanency plan, and the Department's efforts.
>
> In many circumstances, the success of a parent's remedial efforts is intertwined with the efforts of the Department's staff to provide assistance and support. Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not. However, the remedial responsibility does not rest solely on the Department's shoulders. Parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required them to be separated from their children.

. . . . [W]hen the termination proceeding involves grounds that implicate the Department's obligation, establishing that it made reasonable efforts to reunite the child with his or her parents is an essential ingredient of the Department's case. In these cases, the Department has the burden of proving its reasonable efforts even when the parent has not questioned the adequacy of its efforts. *See* Tenn. Code Ann. § 37-1-166(b).

When required, the Department must establish that it has made reasonable efforts to reunite the child with his or her parents by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). This heightened burden of proof does not alter the standard by which the Department's efforts will be judged-the "reasonableness" standard. Rather, it simply requires the Department to present sufficient evidence regarding its reunification efforts to enable the trier-of-fact to conclude, without any serious or substantial doubt, that the Department's remedial efforts were reasonable under all the circumstances.

Tenn. Code Ann. § 37-1-166(c)(2) and (3) address the procedure for proving the reasonableness of the Department's reunification efforts. The Department must file with the court an affidavit identifying the specific services determined to be necessary to reunite the family, as well as the services that have actually been provided to the parents and the child. The affidavit must also address whether the Department has had a reasonable opportunity to provide the needed services to the family and, if not, the reasons why the services have not been provided. Tenn. Code Ann. § 37-1-166(c)(4).

A properly prepared and appropriately detailed affidavit meeting the requirements of Tenn. Code Ann. § 37-1-166(c)(4) should be sufficient to establish the reasonableness of the Department's reunification efforts by clear and convincing evidence. Thus, unless a parent asserts that the Department's efforts were not reasonable, the Department is not required to present additional evidence regarding its remedial efforts. However, if a parent takes issue with the adequacy of the Department's efforts, the Department may be required to put on evidence other than the affidavit regarding its efforts and to make its employees and

contractors involved in these efforts available for cross-examination at trial.[3]

The Department must comply strictly with all statutory requirements when it seeks to terminate a parent's parental rights. However, its failure to file the affidavit of reasonable efforts required by Tenn. Code Ann. § 37-1-166(c) is not fatal if the Department introduces competent evidence specifically identifying the services required in the permanency plan, the services actually provided to the parents, and the outcomes of these services. Simply introducing copies of the contents of the Department's file will not suffice.

*Id*. at \*7-8 (footnote in original; other footnotes omitted; case citations omitted).

The trial court rendered specific findings with respect to the Department's efforts to reunite T.C.E. and Father. It stated:

The child's caseworker, Lindsey Bennett ("FSW Bennett"), made reasonable efforts to assist [Father] in visitation and with completing his requirements in the permanency plans. Her reasonable efforts included discussing methods of obtaining housing with [Father] through HUD and/or an apartment when he was residing with his mother; making home visits to [Father]'s girlfriend's home . . .; providing transportation to [Father] to and from visits with the child; assisting [Father] in scheduling appointments for his alcohol and drug, mental health, and psychosexual assessments; and placing in-home services through Foothills for [Father] to complete specialized parenting classes. Furthermore, FSW Bennett conducted an ongoing diligent search for [Father] during the time in which he abandoned the child and was out of state by continuing to contact family members, telephoning [Father], mailing correspondence, and checking with law enforcement.

---

[3]To avoid delay, a court presiding over a termination case may, with or without the request of the Department, require a parent to put the Department on notice in a timely manner that he or she is challenging the reasonableness of the Department's reunification efforts.

Father argues that DCS failed in its burden to prove reasonable efforts to assist him in completing the tasks assigned in the permanency plan because, with regard to his failings as found by the court, there is little or no proof of assistance. Specifically, Father argues,

> the trial Court based its finding that [Father] failed to substantially comply with the requirements of his Permanency Plan based upon the fact that he could not "provide to the Court proof that he can provide stable housing, stable income, or stable transportation." Yet, the record is devoid of any evidence that the Department helped [Father] in his futile search for employment following his daughter's removal into state custody. The only efforts made by the Department to assist [Father] in obtaining stable housing consisted of the Department providing [Father] with some information about H.U.D. . . . . And the record is devoid of any evidence suggesting that the Department assisted [Father] in regaining his driver's license as required by the permanency plan.

DCS argues that because Father "was totally unavailable for the six months he was in Georgia and was arrested twice, thus disrupting services, the Department was not able to offer him significant services." DCS also points out that the remedial responsibility is not its responsibility alone; the parent also must make reasonable efforts. *In re C.M.M.*, 2004 WL 438326, at \*7.

Unfortunately, neither the affidavit nor the testimony at the termination hearing explains why there were no "efforts" to help Father secure employment or a driver's license and insurance. DCS's "explanation" after the fact makes sense; however, there is no such testimony in the record. It is equally plausible that Father, with his past history of convictions, could not have re-acquired a driver's license regardless of even "herculean" efforts on the part of DCS. It also appears reasonably likely that there was little, if anything, that DCS could have done to help Father secure employment or his driver's license. It appears reasonably likely that he, himself, is his own worst enemy when it comes to securing anything but the most transient of work or transportation. There is, however, no proof of "the resources available to the Department" with regard to what it can do or cannot do toward helping a parent secure employment or transportation. *See In re C.M.M.*, 2004 WL 438326, at \*7. All we know is that there is no proof the Department did anything substantial in this particular case to help Father comply with the three obligations which the court viewed as important enough to justify termination.

The obvious problem with all the possibilities we have listed above is that they are afterthoughts rather than proof. An essential ingredient of DCS's case was to present clear and convincing evidence that its efforts were reasonable. The proof must eliminate any "serious or substantial doubt" about the conclusion to be reached. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Under the clear and convincing evidence standard, it must be "highly probable" that the efforts were reasonable in this particular case. *Tylon*, 2011 WL 1884634. The proof must establish a "firm belief" that the efforts were reasonable. *Id*. One of the factors to be considered is the "closeness of the fit" between the crucial requirements of the permanency plan and the remedial efforts put forth by DCS. *In re C.M.M.*, 2004 WL 438326, at *7. The substantial non-compliance that the trial court found was Father's failure to obtain housing, employment and transportation. The complete lack of proof of any efforts on the part of DCS to help Father remediate these particular problems, without any explanation as to why such efforts were not made, leaves us with no choice but to conclude that DCS did not carry its burden of proof with regard to its own reasonable efforts. It is clear that DCS certainly took some efforts to assist Father. In a case with a more attenuated link between the lack of efforts and the findings of substantial noncompliance of the parent, the proof might have carried the burden. We make the determination as to the reasonableness of the Department's efforts on a case-by-case basis. *In re C.M.M.*, 2004 WL 438326, at *7.

Also, given that we are convinced it is not in T.C.E.'s best interest to reunite her with Father, it would be appropriate for us to remand this case to the trial court for further proceedings on the unanswered questions we have outlined. *In re C.M.M.*, 2004 WL 438326 at *9 (termination of rights vacated based on shortcomings in proof of reasonable efforts by DCS; case remanded for a new trial or "whatever other action [is] warranted"); *State v. B.B.M.*, No. E2004-00491-COA-R3-PT, 2004 WL 2607769 at *9 (Tenn. Ct. App. E.S., filed Nov. 17, 2004)(pretermitting all issues after finding lack of proof of reasonable efforts and instructing court to develop a new permanency plan). However, given that we have found clear and convincing evidence of abandonment, remand will not be necessary. The Department does not have to prevail on all grounds alleged in the petition; proof of one statutory ground of termination by clear and convincing evidence is enough. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). Since the law accepts that a parent's compliance or substantial noncompliance with a permanency plan is intertwined with the Department's efforts, in the absence of clear and convincing evidence of reasonable efforts to aid Father with his problem areas, we will not undertake an independent review of whether Father did, or did not, exhibit substantial noncompliance with the permanency plan. This issue is pretermitted.

D.

Finally, we consider Father's argument that the Department failed to prove it was in T.C.E.'s best interest to terminate his parental rights. First, he touts his own testimony of being drug-free since December of 2009, as evidence that he has made a significant adjustment in behavior so as to make it safe for T.C.E. to be with him. A positive parental "adjustment of circumstance, conduct, or conditions" is an appropriate factor to consider. Tenn. Code Ann. § 36-1-113(i)(1). However, Father omits to mention that he blamed the positive drug screens before his "epiphany" on others. Thus, rather than admit his drug problem and attempt to overcome it, Father chose to deny that he had a drug problem. The court found Father to be a less than credible witness. The court found the clinical psychologist to be credible and explicitly stated that it accepted her testimony. Part of that testimony was that Father probably had not truly reformed from his drug problems. The trial court mentioned the problem of "child safety versus drug use" as one factor in favor of termination of parental rights. It also specifically found that Father "has not made lasting changes in his lifestyle or conduct." Father's argument that he made positive changes to his lifestyle for the benefit of his parent–child relationship rings especially hollow given his willing absence from T.C.E. for six months. Accordingly, his argument is not persuasive.

Father also argues that he made positive adjustments to his housing situation, obviously referring to his alleged relocation to his girlfriend's house. This argument ignores the fact that none of his belongings were present at his girlfriend's home, as would be expected in a live-in arrangement. It also ignores discrepancies between Father's testimony and the girlfriend's testimony. Further, it ignores the tenuous nature of Father's living arrangements; it is abundantly clear that any right he and T.C.E. had to reside in the girlfriend's home were no stronger than the romantic feelings on any given day between a boyfriend and girlfriend. It is clear from the testimony that Father's contribution to living expenses at the girlfriend's home was sporadic at best and not such as to provide him a claim to some sort of interest in her property. This is not the type of "stable" housing situation with which Father was charged with establishing in the permanency plan, as explained by the caseworker at the termination hearing.

We have quoted verbatim the trial court's findings with regard to the best interest of the child. Father's arguments notwithstanding, we find that the court's findings are supported by a preponderance of the evidence and, collectively, furnish clear and convincing evidence that it is in T.C.E.'s best interest to terminate Father's parental rights.

-18-

V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, D.B.E. This matter is remanded for enforcement of the trial court's judgment and for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE